<u>**FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                                        :
IN RE                                   :
                                        :    CHAPTER 11
                                        :
                                        :
Greater American Land Resources, Inc.,  :
                                        :    CASE NO.:   08-14781  (NLW)
                        Debtor.         :
                                        :
                                        :
                                        :
                                        :    **OPINION**
                                        :
                                        :
                                        :
_____:
```

**FILED**
JAMES J. WALDRON, CLERK

July 14, 2011

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: /s/Diana Reaves, Deputy

**Before:**     **HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Morris S. Bauer, Esq.
Norris McLaughlin & Marcus, P.A.
721 Route 202-206
P.O. Box 1018
Somerville, NJ 08876-1018
Attorney for Debtor

Jared J. Monaco, Esq.
Gilmore & Monahan, P.C.
Ten Allen Street
P.O. Box 1540
Toms River, NJ 08754
Attorney for Township of Brick

This matter is before the court on the motion by the Township of Brick ("Brick") for relief from the automatic stay pursuant to 11 U.S.C. § 362 to collect unpaid taxes, and for permission to amend its proof of claim. As set forth below, the court has determined that neither form of relief sought by Brick is appropriate.

The court has jurisdiction to review and determine this matter under 28 U.S.C. §§ 1334(b) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This matter is a core proceeding under 28 U.S.C. §157(b)(2)(B), (G),(K) and (L).

## STATEMENT OF FACTS

**A. Procedural History and Debtor's Chapter 11 Plan**

On March 18, 2008 ("Petition Date"), Greater American Land Resources, Inc. ("Debtor") filed for reorganization under Chapter 11 of title 11 of the United States Code ("Bankruptcy Code"). The Debtor is in the business of acquiring, owning and selling real property. Throughout this Chapter 11 reorganization, the Debtor continued to operate its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107-1108. Perhaps because the Debtor listed less than a dozen unsecured creditors, an Official Committee of Unsecured Creditors was not formed in this case.

The notice of Chapter 11 Bankruptcy Case, Meeting of Creditors and Deadlines ("Chapter 11 Notice") established July 15, 2008 as the bar date for filing proofs of claim. Brick was the

only creditor to file a Proof of Claim.[1] Its proof of claim, filed on April 23, 2008, claimed the sum of $30,504.08 (plus any accrued interest and penalties) solely with respect to Lot 17, Block 701.

Schedule A - Real Property, annexed to Debtor's bankruptcy petition, listed a fee simple interest in two vacant parcels of real estate: Lot 5, Block 701, in Brick Township, N.J. ("Lot 5") and Lot 17, Block 701 in Brick Township, N.J. ("Lot 17"). On Schedule B - Personal Property, the Debtor identified, inter alia, a "suit against Plymouth Park Tax Services to recover real estate taken without due process." Consistent with the foregoing, on Schedule D - Creditors Holding Secured Claims, the Debtor scheduled Brick Township as having a lien against Lot 17, and Plymouth Park Tax Services as holding a tax sale certificate for Lot 5. In May 2008 the Debtor instituted an adversary proceeding to avoid the tax foreclosure judgment obtained by Plymouth Park Tax Services with regard to Lot 5. That litigation was settled by means of a consent order entered by the court on July 25, 2008. No notice of settlement under Fed. R. Bank. P. 9019 was provided to creditors.

On December 24, 2009, the Debtor filed its Chapter 11 Plan and Disclosure Statement ("Initial Plan and Initial Disclosure Statement"), which were subsequently amended in May 2010 by the filing of the First Modified Plan of Reorganization ("Modified Plan") and First Modified Disclosure Statement ("Modified Disclosure Statement"). Both the Initial and Modified Plans as well as the Initial and Modified Disclosure Statements identified the Debtor, rather than Plymouth

---

[1] The certificate of service for the Chapter 11 Notice shows service on Brick at 401 Chambersbridge Road, Brick, NJ 08723-2807, the very address that Brick provided on its Proof of Claim. All subsequent court notices sent to Brick were mailed to the same address.

3

Park Tax Services, as the owner of Lot 5.[2] The Modified Disclosure Statement described the settlement with Plymouth Park Tax Services as follows:

> During the course of the Chapter 11 Case, the Debtor filed against Plymouth Park a Complaint to Vacate Judgment and to Avoid Transfer as Fraudulent Pursuant to 11 U.S.C. § 541(a)(1) and Other Related Relief relating to Lot 5, Block 701. On July 25, 2008, the Court entered a Consent Order Resolving Adversary Proceeding. Pursuant to the Consent Order, the Debtor agreed to redeem the tax sale certificate held by Plymouth Park by tendering the amount of $90,000.00, with $9,000.00 being paid within five (5) days of the entry of the Order and the balance of $81,000.00 to be paid within ninety (90) from entry of the Consent Order. The payment term was subsequently modified by written agreement between the parties. As of this date, the Debtor has satisfied all of the payment obligations owing to Plymouth Park. Thus, the Debtor again is the owner of Lot 5, Block 701.

(Modified Disclosure Statement at 7)  Brick's claim in the Modified Plan was classified and treated as follows:

> Secured Claims are Claims secured by liens on property of the Debtor's estate. The following represents all classes containing the Debtor's secured pre-petition Secured Claims and their treatment under this Plan:
>> **Class 1** - The Secured Claim of the Township of Brick. The Class One Claim shall be paid its Allowed Claim on the later of (i) the Effective Date or (ii) such date that the Claim becomes an Allowed Claim. This Class is <u>not</u> impaired, and therefore is not entitled to vote on the Plan.

(Modified Plan at 9)  Furthermore, an Allowed Claim was defined as follows:

> **Allowed** when used as an adjective preceding the words "Claim" ... shall mean any Claim ... proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for

---

[2] In particular, the Modified Plan at Article 2 defined "Property" as "the Debtor's real property identified on the tax maps of the Township of Brick, Ocean County, New Jersey as Lot 5, Block 701 and Lot 17, Block 701." (Modified Plan at 6)

> filing proofs of Claim ... against the Debtor,  ... and ... a Claim as to which no objection to the allowance thereof has been interposed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, Local Rules...

(Modified Plan at 2) (emphasis in the original). The Debtor's Modified Plan was confirmed by an order dated July 30, 2010 ("Confirmation Order").

### B.     Brick's Motion

Approximately three months after confirmation of the Modified Plan, Brick moved for relief from the automatic stay because its secured claim on Lot 17 had not been paid, as required by the Modified Plan. It also sought permission to amend its proof of claim to include the taxes due on Lot 5. Specifically, in its motion Brick sought payment of the following amounts:

> **Lot 17** - $30,504.08 (prepetition taxes) plus $13,497.69 (postpetition taxes)
>
> **Lot  5** - $59,180.47 (prepetition taxes) plus  $84,394.51 (postpetition taxes)

The Debtor did not challenge Brick's demand for payment of its secured claim for Lot 17, including the postpetition taxes that accrued during the Chapter 11 case. Although it did not explain why it had not timely paid Brick's Allowed Claim, the Debtor stated that it would tender payment on or before the return date of Brick's motion. However, with respect to Lot 5, the Debtor vigorously contended that it was simply too late for Brick to seek payment for taxes that accrued both prepetition and preconfirmation.

Essentially, Brick grounds its request for either stay relief or amendment of its claim on what it characterizes as newly discovered evidence. The certification of the Brick Tax Collector states in pertinent part that:

5

> in regard to Block 701/Lot 5, it was the Township's understanding that this property was foreclosed by Plymouth Park Tax Services LLC on August 25, 2006. However, upon receipt of debtor's Modified Disclosure Statement and Modified Plan, the Township first became aware that debtor's property was not foreclosed, but was still owned by debtor. Being that it was the Township's understanding that the aforementioned property has been foreclosed, the Township did not file a proof of claim in regard to taxes owed. The amount owed on this property at the time of the Township's original proof of claim was $59,180.47.

The Debtor disputes that these facts constitute newly discovered evidence, or even excusable neglect. It points out that Brick was regularly served with notices in the Chapter 11 case. In particular, the Debtor observes that Brick was served with notice of the hearing on the Initial Disclosure Statement and could have obtained a copy of the Initial Disclosure Statement prior to the hearing date. Had Brick done so, it would have discovered (i) that the Debtor commenced an adversary proceeding to avoid the August 25, 2006 judgment that foreclosed the Debtor's interest in Lot 5, and (ii) that the matter had been consensually resolved with the Debtor redeeming the tax sale certificate by paying $90,000 to Plymouth Park Tax Services and recovering ownership of Lot 5. As evidenced by Brick Tax Collector's certification quoted above, this information was also repeated in the Modified Disclosure Statement that was mailed to Brick together with the Modified Plan prior to the confirmation hearing. The Debtor was also quick to note that prior to confirmation Brick did not seek amendment of its proof of claim to include the Debtor's tax obligations with respect to Lot 5, and also did not object to the Modified Plan or appear at the confirmation hearing.

The Debtor further asserts that because the Modified Plan has been confirmed, Brick's rights are governed exclusively by the terms of the Modified Plan, and Brick's failure to assert a

6

claim for taxes owed on Lot 5 prior to confirmation bars it from doing so now. The Debtor points to the language of Article IV of the Modified Plan that provides that "the Confirmation revests all of the property of the estate in the Debtor, free and clear of all Claims and Equity Interests." (Modified Plan at 15) Moreover, "claim" is defined in the Modified Plan as "any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured..." (*Id.* at 3) The court's review also indicates that "Equity Interest" is defined in the Modified Plan as "any interest of ownership in the Debtor." (*Id.* at 6) Furthermore, under the terms of the Modified Plan, the effective date of the Plan ("Effective Date") is the day on which the Order of Confirmation ("Confirmation Order") becomes final, which occurred on August 14, 2010. (*Id.*)

As is usual, the Confirmation Order mirrors many of the provisions of the Modified Plan. It explicitly discharges the Debtor

> … from all debts and Claims that arose against it before the date of entry of this Confirmation Order ... whether or not (a) a proof of claim based upon such a debt is filed or deemed to be filed or deemed to be filed under § 501 of the Bankruptcy Code, (b) such Claim is allowed under § 502 of the Bankruptcy Code, (c) the holder of such Claim has accepted the Plan.

(Confirmation Order ¶ 2)

Other relevant provisions in the Confirmation Order provide that:

> The commencement or continuation of any action, or the employment of process with respect to any debt due and owing by the Debtor, or any act to collect, recover, or offset any debt due and owing by the Debtor, as a liability of the Debtor, or from property of the Debtor, be, and it hereby is, forever enjoined. (Confirmation Order ¶ 5)
>
> Pursuant to section 1141 of the Bankruptcy Code, the provisions of the Plan

and this Confirmation Order shall be, and be forever afterwards, binding on the Debtor, each Creditor of the Debtor, each holder in Interest, and each other party in interest in this Chapter 11 Case. (Confirmation Order ¶ 10)

To the extent that there are any inconsistencies between this Order and the Plan, this Order shall control. (Confirmation Order ¶ 13)

The failure to specifically include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in it entirety. (Confirmation Order ¶ 15)

The Confirmation Order also dissolved the automatic stay on the Effective Date. (Confirmation Order ¶ 9)

## DISCUSSION

### A.    Automatic Stay

As an alternative to amending its claim, Brick requested relief from the automatic stay in order to commence collection efforts with respect to the taxes that have accrued (prepetition and postpetition) with regard to Lot 5. However, the automatic stay no longer exists because confirmation of the Debtor's First Modified Plan revested estate property in the Debtor and discharged the Debtor from all preconfirmation debts. The automatic stay is generally dissolved once a debtor has completed a reorganization process and the effective date of the confirmation order has passed. *See In re Am. Freight Sys., Inc.,* 205 B.R. 290, 296 (D. Kan. 1996); 6 WILLIAM L. NORTON, JR., NORTON BANKR. L. & PRAC. 3d § 114:1 (2011). This result is essentially a product of the application of the pertinent statutory sections and the Debtor's Modified Plan terms.

Section 1141(b) states that unless the plan or the confirmation order provides otherwise, the confirmation of a plan vests all property of the estate in the debtor. And, §362(c)(1) expressly sets forth that the automatic stay continues only "until such property is no longer property of the estate...". Here, both the Modified Plan and the Confirmation Order provide for property of the estate to revest in the Debtor. Additionally, under § 1141(d)(1)(A) unless the plan or the confirmation order provides otherwise, a debtor is discharged of any debt that arose before confirmation. As a result, the automatic stay as to property of the debtor is similarly discontinued because under § 362(c)(2)(C), "the stay of any other act under subsection (a) of this section terminates when discharge is granted." Again, both the Modified Plan and the Confirmation Order provide for the discharge of preconfirmation debts.

### B.     Effect of Confirmation

Both the Modified Plan and the Confirmation Order have effectively eliminated the Debtor's liability for any debts, except as provided for by the plan. *In re Benjamin Coal Co.*, 978 F.2d 823, 827 (3d Cir. 1992) (as a result of court approval of the plan each claimant gets a "new" claim based on the treatment accorded the claimant in the plan). The question then remains whether Brick's lien on Lot 5 survives *in rem*. The Debtor contends that under § 1141(c) Brick's lien is also extinguished. In response, Brick counters that its lien has remained unaffected by confirmation. Section 1141 governs the effects of plan confirmation and provides, in relevant part:

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except

> as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

11 U.S.C. § 1141(c).

In part, the Debtor's argument is grounded in the claim preclusion effect of the confirmation order. Pursuant to § 1141, "[o]nce confirmed, a Chapter 11 plan acts as both a contract which binds the parties and as an order of the bankruptcy court." *JCB, Inc. v. Union Planters Bank, NA,* 539 F.3d 862, 870 (8th Cir. 2008) (citations omitted). It is widely recognized that an order confirming a plan of reorganization is entitled to res judicata effect. *Stoll v. Gottlieb*, 305 U.S. 165, 170-71 (1938). The plan confirmation order is res judicata as to all issues decided or which could have been decided before confirmation occurs. *Donaldson v. Bernstein,* 104 F.3d 547, 555 (3d Cir. 1997) (permitting trustee's suit for breach of fiduciary duty to continue because it was grounded in postconfirmation, but preconversion conduct); *First Union Comm. Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enter., Inc.),* 81 F.3d 1310, 1315-16 (4th Cir. 1996) (lender's postconfirmation objection to secured claim precluded because claim was addressed in the confirmation process); *Sanders Confectionary Products, Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 480 (6th Cir. 1992) (confirmation of a plan which included cancellation of a guaranty to pay a bond precluded state court suit); *Sure-Snap Corp. v. State St. Bank & Trust Co. (In re Sure-Snap Corp.)* 948 F.2d 869, 873 (2d Cir. 1991) (confirmation order is res judicata as to lender liability claims that were not raised prior to confirmation).

However, with respect to claims secured by liens on property, § 1141 must be reconciled

10

with § 506(d) which essentially permits a secured creditor's lien to pass through bankruptcy unaffected.[3] Section 506(d) codified the Supreme Court decision in *Long v. Bullard*, 117 U.S. 617, 620-21 (1886), which stands for the proposition that secured liens pass through bankruptcy unaffected. *FDIC v. Union Entities (In re Be-Mac Transp. Co., Inc.),* 82 F.3d 1020, 1025 (8th Cir. 1996).

There are a number of decisions that address the manner in which a plan of reorganization can extinguish a prepetition lien. The Debtor cites *In re American Properties, Inc.*, 30 B.R. 239, 242-43 (Bankr. D. Kan. 1983) which holds that a county taxing authority cannot enforce a prepetition lien against the property of the reorganized debtor where it failed to file a proof of claim, failed to object to a confirmation of the plan and the plan was confirmed. There was no discussion of § 506(d) in *American Properties*. Brick, on the other hand, relies on *Relihan v. Exchange Bank* 69 B.R. 122, 126-27 (S.D. Ga. 1985) that relies on § 506(d) and holds that if a secured creditor does participate in the bankruptcy case, in effect "ignoring" the bankruptcy, the secured creditor's lien passes through bankruptcy unaffected.

In the last several years various circuit courts have extensively addressed the issue of the effect of a confirmed Chapter 11 plan on a secured creditor's lien. Because these decisions provide a comprehensive framework for analysis, the court will apply them to the matter at hand.

---

[3] Section 506(d)(2) provides, in relevant part:

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless--

(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

In this circuit *Gen. Elec. Credit Corp. v. Nardulli & Sons, Inc.*, 836 F.2d 184 (3d Cir. 1988) provides some guidance. It did not address § 506(d), but did state that neither § 1141(b) or (c) requires that a plan expressly divest secured creditors of their security interests, but rather a plan must provide for retention of security interests for such interests to survive confirmation of a plan. 836 F.2d at 189. The Court's examination of the plan revealed that the plan identified General Electric Credit Corp. ("GECC") as a secured creditor and, as part of the treatment of the GECC claim, also provided for a proportionate reduction of payments upon sale of the assets subject to its security interest. *Id.* As a result, the Third Circuit found that the plan preserved the GECC security interest and that it continued postpetition. *Id.*

Subsequently, the Seventh Circuit addressed a plan that was silent as to the secured creditor's lien. *In re Penrod*, 50 F.3d 459 (7th Cir. 1995). The debtors in *Penrod* were hog farmers who gave a prepetition security interest in their hogs to Mutual Guaranty Corporation ("Mutual Guaranty") to secure a $150,000 loan. *Id.* at 461. After the Penrods filed for relief under Chapter 11, Mutual Guaranty filed a proof of claim. *Id.* Ultimately, a plan of reorganization was filed and confirmed. *Id.* The plan provided for Mutual Guaranty's claim to be paid in full with interest. *Id.* Neither the plan nor the confirmation order referenced the lien. Shortly after the plan went into effect the hogs became infected, and the Penrods had to sell them for slaughter. Mutual Guaranty thereafter sought to enforce its lien in the sale proceeds. *Id.* The Penrods objected, claiming that the plan extinguished Mutual Guaranty's lien. *Id.*

As framed by Judge Posner, the question before the court was: what is the default rule when neither the plan nor the confirmation order mentions preexisting liens? *Id.* at 462.

Specifically referencing § 1141(a), the court concluded that "the default rule for secured creditors who file claims for which provision is made in the plan of reorganization is extinction and is found in the Code itself." *Id.* The court further explained that a lien is an interest covered by § 1141(c) because the Code defines a lien as an interest in property and defines a security agreement as a lien created by an agreement. *Id.* at 463. Accordingly, the court stated that:

> unless the plan of reorganization, or the order confirming the plan, says that a lien is preserved, it is extinguished by the confirmation. This is provided, we emphasize, that the holder of the lien participated in the reorganization. If he did not, his lien would not be "property dealt with by the plan," and so the section would not apply.

*Id.*

The Seventh Circuit further explained its *Penrod* decision in *Airadigm Communs., Inc. v. FCC (In re Airadigm Communs., Inc.),* 519 F.3d 640 (7th Cir. 2008). In that case Airadigm Communications, a cellular communications company, successfully bid for fifteen personal communications services ("PCS") licenses from the Federal Communications Commission ("FCC") and elected to pay off the licenses under an installment plan. *Id.* at 645. Subsequently, when Airadigm Communications filed its Chapter 11 case, the FCC cancelled its licenses. *Id.* When the FCC filed a proof of claim in the debtor's bankruptcy it identified the claim as unsecured because of its cancellation of the PCS licenses. *Id.* The FCC further provided in its claim that if it was later determined that it lacked authority to cancel the licenses, then its claim was secured by the licenses. *Id.* The Airadigm Communications' reorganization plan provided that the FCC had an allowed claim and laid out several contingencies should the FCC reinstate the licenses by 2002. *Id.* The plan did not expressly preserve the FCC's security interest in

licenses. *Id.* It was later determined that the cancellations were invalid and the FCC was directed to reinstate the licenses. *Id.* at 646. In light of the reinstatement, Airadigm Communications filed a second petition for reorganization. *Id.* It also filed an adversary proceeding seeking to divest the FCC of its security interests in the PCS licenses based on the fact that the plan of reorganization in the first Chapter 11 bankruptcy made no mention of the status of the FCC's security interests following the reorganization. *Id.* at 646-47.

Pursuant to the *Penrod* criteria, the parties conceded that the FCC "participated in the reorganization."*Id.* at 648. However, the parties did not agree on whether the reorganization plan "dealt with" the licenses such that they were brought within the ambit of the default rule set forth in *Penrod*. In analyzing whether the FCC's lien was extinguished, the court explained the *Penrod* rule:

> <u>Section 1141(c) and the default rule announced in *Penrod* ensure that a potential creditor can look to a reorganization plan to determine the extent of any other creditor's continuing interest in property after the reorganization.</u> *Penrod*, 50 F.3d at 463. If the property is "dealt with" by the plan, the property is "free and clear of all claims and interests of creditors." 11 U.S.C. § 1141(c).
>
> But for the plan to "deal [ ] with" property for purposes of § 1141(c), the plan itself must give some indication that it has compensated the creditor for or otherwise impliedly affected its interest. In other words, <u>there must be some evidence that the powers to affect the creditor's interest contained in the bankruptcy code - to exchange, extinguish, impair or otherwise impact the interest - have in some way been exercised - whether expressly or impliedly</u>.

*Airadigm*, 519 F.3d at 649 (emphasis added).

The court examined the terms of the Airadigm Communications' plan and determined that the plan only mentioned the licenses to the extent that the FCC would eventually reinstate

14

Airdigm Communications' interest in the licenses prior to June 2002, an event which never occurred. *Id*. As a result, the court concluded that a potential creditor "transacting with Airadigm after June 2002 could not look to the plan to determine any other creditor's potential interests in the licenses." *Id.* Therefore, the court concluded that the *Penrod* rule divesting the secured creditor's interest did not control. *Id.*

In *FDIC v. Union Entities (In re Be-Mac Transp. Co., Inc.)*, 83 F.3d 1020, 1025 (8th Cir. 1996) the Eighth Circuit acknowledged the rule articulated in *Penrod,* agreeing that "a secured creditor who participates in bankruptcy may also lose its lien by confirmation of a reorganization plan which does not expressly preserve the lien." However, the court in *Be-Mac* did not void the FDIC's lien because it found that the FDIC was not afforded an opportunity to participate as a secured creditor in the bankruptcy proceeding. *Id.* at 1027.

Similarly, in *In re Barton Indus.,* 104 F.3d 1241, 1245 (10th Cir. 1997), the Tenth Circuit acknowledged that confirmation of a Chapter 11 plan may void secured liens. However, it also stated that in order to satisfy due process, the secured creditors had to receive adequate notice about the treatment of their class of claim, so that they could make an informed judgment about the plan. *Id.* at 1245. In that case the court found that the plan did not specifically refer to the property on which the creditor had a lien, the creditor's interest in the property or the plan's effect on the property. *Id.* at 1246.

Agreeing with *Penrod, Be-Mac*, and *Barton,* the Fourth Circuit has held that a secured creditor's lien not preserved in the plan is extinguished. *In re Reg'l Bldg. Sys., Inc.*, 254 F.3d 528, 531 (4th Cir. 2001). There, the debtor identified the secured creditor as unsecured because

15

its collateral was value at zero. *Id.* at 529. The secured creditor apparently agreed because it filed unsecured claims and participated in the case on the Unsecured Creditor's Committee. *Id.* at 530. Although the debtor received $5 million from the settlement of a lawsuit, the plan did not provide for the secured creditors' lien to attach to the proceeds. *Id.* However, the plan did not provide for a distribution to the secured creditor (on its unsecured claim) after certain other claims were paid. *Id.* Several months after confirmation, the secured creditor filed an amended claim, now asserting a secured claim. *Id.* The Fourth Circuit agreed with the district court and the bankruptcy court that the secured creditors' lien was extinguished by the plan confirmation. *Id.* at 530-31. It pointed out that the plan was confirmed without any objections by the secured creditor, the $5 million was "dealt with" by the plan inasmuch as it was distributed to creditors under the terms of the plan, and neither the plan nor confirmation order preserved the secured creditors' lien. *Id.* at 531.

Finally, the Fifth Circuit in *In re Ahern Enters., Inc.*, 507 F.3d 817 (5th Cir. 2007), surveyed the holdings from various circuits and enunciated the following factors for determining that "a lien can be voided under § 1141(c): (1) the plan must be confirmed; (2) the property that is subject to the lien must be dealt with by the plan; (3) the lien holder must participate in the reorganization; and (4) the plan must not preserve the lien." *Id.* at 822. Applying those factors, the court held that the creditor's lien was extinguished because all of the factors were met in the matter before it. *Id.* at 825.

*Ahern* also addressed the split among the courts in interpreting and applying *Penrod*. It observed that some courts have concluded that *Penrod* requires the lien itself be dealt with in the

plan, while others interpret *Penrod* as requiring that the property subject to the plan be dealt with in the plan. *Id*. at 823. It adopted the latter view:

> We note first that, according to *Penrod,* the condition that the lien itself be "property dealt with by the plan" can be satisfied by the lien holder's participation in the reorganization. *Penrod*, 50 F.3d at 463. More importantly, a requirement that the lien itself be dealt with by the plan is not a sensible reading of section 1141(c). Section 1141(c) provides that "property dealt with by the plan is free and clear of all claims and interests. . ." If the lien is the property that must be dealt with, then section 1141(c) would have to be read to say that "liens dealt with by the plan are free and clear of liens." Because liens constitute one of the interests that section 1141(c) extinguishes, it is sensible to interpret "property dealt with by the plan" as the property subject to the lien.

*Id.* This court is persuaded by *Ahern's* analysis.

To determine whether the foregoing authority establishes that the Brick tax lien on Lot 5 has been extinguished by operation of § 1141(c) and the Confirmation Order, it is helpful to also consider the effect of confirmation of the Debtor's Modified Plan on the Lot 17 tax lien. For ease of reference, the court will apply the four factors as described in *Ahern.*

With regard to Lot 17, it is easily discerned that Brick participated in the reorganization. It filed a secured proof of claim that also provided for accruing interest and penalties. Likewise, the property was dealt with by the plan because Property is a defined term in the Modified Plan and explicitly identifies Lot 17 as within the ambit of the definition. Further, the Modified Plan explicitly provides that (i) secured claims are claims secured by liens on the Debtor's property and in Class 1 provides for payment of Brick's Allowed Claim. Inasmuch as the Debtor's Modified Plan defines Allowed Claims as including a proof of claim to which no objection has been interposed, Brick's proof of claim for Lot 17 falls within Class 1 and is conclusively dealt with by the Modified Plan. Moreover, by its description of secured claim in connection with

Class 1 it appears to the court that the Modified Plan preserved Brick's tax lien on Lot 17.

Turning to Brick's tax lien on Lot 5, it does not appear to the court that Brick participated in the reorganization case with regard to this claim. In this regard, the court must take into account that in essence Brick held two claims. That is, it held two different tax liens on two different properties. At the outset of this Chapter 11 case it did not file a proof of claim for taxes due on Lot 5 - no doubt because it understood that Plymouth Park Tax Services was the owner of Lot 5. However, even after it learned that the Debtor had reacquired its ownership interest in Lot 5, Brick still took no steps to participate. It didn't move to file a late claim or to amend its existing claim, and it did not participate in the confirmation process.

Nor is it evident that the Modified Plan dealt with Brick's tax lien on Lot 5. In its current motion, Brick has identified prepetition and postpetition taxes as due on Lot 5. The court concludes that when the Debtor filed its Modified Plan it knew that Brick held a tax lien for unpaid taxes. It is reasonable to expect that in its negotiations with Plymouth Park Tax Services the Debtor learned of the existence of accrued prepetition taxes. Further, the adversary proceeding against Plymouth Park Tax Services was settled in July 2008 and the Modified Plan was filed in May 2010. As the party responsible for payment of taxes in that period the Debtor had to have been aware that taxes were accruing. Despite this knowledge, although the Modified Plan identifies Lot 5 as Debtor's property, it does not provide any treatment for Brick's prepetition tax lien. Lot 5 plainly does not fall within the scope of Class 1 because Brick never filed a proof of claim for Lot 5. As a result, there is no Lot 5 Allowed Claim that is within the description of a Class 1 claim. Thus, the *Penrod* decision does not provide a basis for

extinguishing Brick's lien on Lot 5. In *Penrod* the plan provided for payment of the secured creditor's claim but did not provide any treatment for its lien. Here, the Debtor does neither. Moreover, like the court in *Barton*, this court believes that in order to satisfy due process, Brick had to receive some notice that its claim was being treated in the plan. *Barton*, 104 F.3d at 1245. Here, both the Modified Plan and Modified Disclosure Statement are completely silent as to Brick's unpaid taxes and lien on Lot 5.

As a result, this court is not persuaded that the Modified Plan "dealt with" Brick's claim for purposes of § 1141(c). As the court in *Airadigm* pointed out, "there must be some evidence in the plan that the powers to affect the creditor's interest contained in the bankruptcy code - to exchange, extinguish, impair or otherwise impact the interest - have been in some way exercised - whether expressly or impliedly." 519 F.3d at 649. Furthermore, the Third Circuit Court of Appeals has "... refused to treat confirmed bankruptcy plans as res judicata with respect to the claims of creditors who did not receive notice that was sufficient under the circumstances..." *In re Mansaray-Ruffin*, 530 F.3d 230, 239 (3d Cir. 2008). "[A] creditor's actual knowledge regarding the bankruptcy proceeding does not eliminate... due process concerns." *Id.* (citing *Harbor Tank Storage,* 385 F.2d 111, 114-16 (3d Cir. 1967)).

The Debtor insists that the plain language of Article IV of the Modified Plan extinguished Brick's tax lien. The language of Article IV of the Modified Plan simply states that "all property of the estate [which included Lot 5] revested in the Debtor, free and clear of all Claims and Equity Interests." It is generally recognized that the term "interest" encompasses a lien. *Penrod*, 50 F.3d at 463. Thus, under § 1141(c) which provides in pertinent part, "except as

19

otherwise provided in the plan or order confirming the plan ... property dealt with by the plan is free and clear of all claims and interests..." a lien can be extinguished. 11 U.S.C. § 1141(c). Here, in Article IV of the Modified Plan the Debtor actually modifies the effect of § 1141(c) by limiting the term "Interests" to Equity Interest. As a result, Section IV does not extinguish Brick's tax lien on Lot 5.

Because this court has determined that Brick did not "participate" in the Debtor's bankruptcy sufficiently to allow its lien on Lot 5 to be extinguished and its tax lien was not dealt with by the Modified Plan, Brick's lien survives *in rem* pursuant to § 506(d). Having concluded that Brick's lien on Lot 5 passes through the Debtor's bankruptcy unaffected, it is not necessary for this court to reach the issue of whether Brick should be allowed to amend its proof of claim post-confirmation.

## **CONCLUSION**

For the forgoing reasons, Brick's motion to allow relief from the automatic stay pursuant to 11 U.S.C. § 362 and to permit Brick to amend its proof of claim is denied. As explained above, under § 506(d) Brick's lien on Lot 5 passes through the Debtor's bankruptcy unaffected.

Dated: July 14, 2011                 ____/S/_____
                                     NOVALYN L. WINFIELD
                                     United States Bankruptcy Judge